It is our contention that Leon Rosen, in the final amendment to his trust, set forth a very clear and specific mathematical formula as to how these funds should be divided. In looking at this argument in advance, I worried I'd have to go through that formula as I did in my brief, but the defendant doesn't contest that. If the formula is, as the defense says, literally applied, it comes to a very different conclusion than what actually happened. Of course, it's our position that we're not afraid of the word literally because, frankly, we're not afraid of the word literally. Frankly, it means do just what the words say. A literal application, as the defense said, with the amounts of money that were in the trust would have resulted in no money going directly to Werner Rosen. In fact, Adrian and Jennifer, the other daughter and granddaughter, would have received less than the amount that was intended for them. Under your computation, what are the actual numbers? Werner receives nothing? Werner receives nothing directly from the trust. The evidence showed that she received a great deal outside of the trust. What evidence was that? She received insurance proceeds. She received joint tenancy property. And what was that all worth? Let us know. Hundreds of thousands of dollars, I believe. I know the numbers are there. What do you mean you believe? You said it was in the record. What is in the record? What is the amount that Werner received from the life insurance proceeds and joint tenancy and property? Judge, there was $17,000 in insurance proceeds. There was a condominium that was not included in the tax returns that was worth an area of half a million dollars. There was another condominium that was joint tenancy property down in Florida that had a similar value. We don't know what she got other than that because, frankly, that's not what the case is about down below. No, but there was a will, was there not? There was. And was there some discussion in that about what his intent was to do with his property? The discussion of what was done with his property contains in section 4.01 of his trust document where he set forth a specific mathematical formula. There's no place, and counsel argues and has argued always, to look at all the documents. There's nowhere in any of the documents that she has cited to that says this should be 50% to Werner, 25% each to Adrian and Jennifer. What was the document called the restatement? Pardon me? What was the document that was called the restatement? Wasn't there a document called the restatement? There was a document. What was that part? Called the restatement. Well, it didn't tell us anything specifically about how this was to be divided other than the formula we find in section 4.01. Was that part of the trust document or was that part of some... I believe that was part of the trust. Now, did this person, Werner, have joint tenancy in these properties at the time of her father's death? Yes, the properties had passed outside the trust. And did she have some... does the record suggest in any way that she had some sort of caregiving position with either of the parents before they died? No, Your Honor. I've never heard of anything even close to that. All right. What I see happening here, based on the defendant's argument, nowhere do they say, here's specific language in the documents that show it should be 50, 25, 25. It's basically vague in general. And in fact, she cites through parts of the state documents that have been amended. I don't see how you can go to documents that have been amended and use that as the basis for deciding to ignore a formula that was set forth in the final amendment and do something else based on the stuff that was amended. Mr. Rosen died in 1999? Correct. And was there anything that was disposed of in the probate court? Everything went into the trust. Into the trust. That wasn't in joint tenancy. All right. And this lawsuit was filed in the Chantry Division at what point? Judge, it was filed in the early 2000s. So it's been going on for some time. It has been going on for some time, Your Honor. Now, what you've indicated this morning is that the joint tenancy property, at least at some point, was worth approximately $1 million? Yes, Your Honor. And then $17,000 was life insurance proceeds? Yes. And what would be the amount of the trust that would be allocated in hard numbers to Adrian and her daughter Jennifer? What would they have received had we followed the formula? Yes. They would have each received slightly over $1 million. I think it was $2.3 million, approximately, was the amount after taxes were paid, expenses were paid, et cetera, that was left to be divided. Had the property that did not pass through the trust, the joint tenancy property, for example, if all that had been put in the trust, which Leon Rosen could have done, then there would have been money that would have gone to Myrna. Had he increased the size of his estate late in life and put that in the trust, then there would have been more money for Myrna. We don't really know why he did what he did, why he didn't do other things. There's no way we can tell. All we can do is apply this mathematical formula. Now, the defendant makes references to Scrivener's errors. Yes, talk about that. What are these alleged Scrivener's errors? Well, a Scrivener's error is something like a typo, a very small, easily correctable mistake. Now, the defense has never said what specifically the Scrivener's error is. They never pled it as an affirmative defense or as a counterclaim. They never pled it. They just made reference to it on occasion, and they certainly refer to it here. Latent ambiguities, I'm not sure if a latent ambiguity is different from an ambiguity, but early on in this case, the defense said that the documents were not ambiguous, that they were clear, and certainly the mathematical formula is very, very clear. To our surprise, at page 12 of their brief, they refer to the mathematical formula and say, well, if, this is a quote, if properly drafted, well, now are they saying that there was a mistake in the drafting of this document? Well, if that's the case, it's not for this court to try to discern from these vague general statements that there was a mistake. No discovery was taken on that issue because it wasn't pled. And apparently they're asking you to figure out what that mistake is and say, well, you corrected that mistake when you ignored the mathematical formula set forth in Leon's trust and instead applied a 50-25-25 break. Now, Frieda's trust provided no amount of money for Myrna either. Leon had the right to, if she predeceased him as she did, to decide where that money went. But the fact of the matter is, the way she had set it up, she left everything to the daughter, Adrian, and her granddaughter, Jennifer, didn't she? Yes, the intention was that the money would go to them from Frieda's trust. What we see here is this case is really like a case that was cited in my brief, estate versus loss, where, again, there was a mathematical formula based on federal income tax numbers. There were people that expected to receive money under that. They didn't. The money ran out. Seventy-five percent was supposed to go to specific requests, and then there were those who received what was left. There was nothing left. That's what happens here. There was nothing left. 4.01 said whatever's left goes to Myrna. There was nothing left. It's really not unusual in estate cases for that to happen. Why were two summary judgment motions, or maybe four? I don't know. How many were denied before Judge Pantley granted summary judgment? Judge Quinn heard cross-motion for summary judgment twice. Both times he said the defense is right, it should be 50-25-25, but both times he said, well, there's other factual issues, so I'm not going to enter judgment. I never understood what those factual issues were. We thought he had, but we could never appeal his ruling because he said it was not a final judgment. Indeed, he wrote it so that it wasn't. Judge Pantley denied our summary judgment motion, and then shortly before the case was to go to trial, she granted their motion for ruling on major issues. It wasn't styled as a summary judgment motion, but the judge, when she ruled in their favor, with really very little discussion, it appeared mostly just saying, well, I'm just going to go along with Judge Quinn. That's certainly the impression I got. And she did it so that there was a judgment, so it could come up here, because, frankly, this case is not going to be determined until it's determined whether or not that mathematical formula applies or doesn't. What's the real significance of the issue regarding the court requiring that Bank of America be joined? Well, the argument to the defense is that they're a necessary party. What difference does it make for either of you at this point? It makes no difference to me, and it's our contention, it makes no difference to Bank of America. They used to be a co-trustee. They've long since left that position. They just don't have a dog in this fight, much less a present substantial interest, and that's the language from the case is they need a present substantial interest. The defendant cites this case, Lurie v. Rube, a 1964 case, but in that case the co-trustees were both acting as co-trustees at the time, so it made sense that they should both be brought into the case. I think that the Bank of America issue is truly a red herring. As to the attorney's fees, which is part of this case, I'll just stand on my brief. Clearly, if you reverse the finding here as to what was the proper way to distribute these assets, Myrna is not entitled to fees. I think the estate of Riordan cited by us also covers that. She simply is not defending the trust. She's defending the money that she has. Well, was there some other language, though, that... I'm trying to find the language. There was language in the trust that indicated she could be reimbursed fees for, and I believe the phrase was defending the trust. Are you saying that the shall be entitled to reasonable compensation for services rendered is tied to protection of the trust, or is that a separate clause? No, I don't think that has anything to do with her getting attorney's fees. Certainly expenses, when she's administering the trust, have to be paid, and they were paid in this case at the time. But that trust is essentially past history now. She's got the funds that were in that trust. Now she's trying to keep those funds. Anything further? If the court doesn't have any other questions, I'll just reserve my remaining time. Thank you. Good morning, Your Honors.  What evidence is there in the record with respect to assets that passed outside of the trust? And, Your Honor, I would proffer to the court that there is no such evidence, because that issue was never raised. The sole issue before the trial court was whether Myrna was to receive assets of Leon's trust. What passed outside of the trust is wholly irrelevant, and that issue was addressed many times. The reason the condo or life insurance comes up is because plaintiffs are essentially trying to get this court to believe that Myrna was arguing that she was being disinherited, and they're saying, no, no, she wasn't disinherited. She received assets. But again, this court has to look at the four corners of Leon's trust, actually his estate documents in their entirety, to determine whether Myrna, he intended Myrna his daughter, the daughter he named as successor and co-trustee of his trust, the daughter he named as executor of his will, the daughter he named as trustee of the trust he established for his daughter Adrienne, his granddaughter, whether he intended that she receive assets. And, Your Honor, counsel says we've never pointed out where in the documents that that intent is evidenced. Well, first of all, it's evident in the fact that in the original trust, the amendment and restatement of the trust dated September 1992, paragraph section 401 specifically creates a portion for Myrna and a portion for Adrienne and Jennifer's trust, 50-50. Where is that? That is in the amendment and restatement. Here it is. If you turn to Article 4 of the original amendment, that's C-01-404, Appendix 53, you see Article 4, Distribution of Family Trust, Section 401. And if you look at subparagraph, I'm sorry, that is the Fourth Amendment. Oh, no, I'm sorry. It says in subparagraph A, one share shall be created for and distributed to Myrna outright and free, and then one share for Adrienne and Jennifer, or another share, one portion for Adrienne, which is subparagraph B-I, and one portion for Jennifer, subparagraph B-2, and those were to go in trust. That says one share two and one share two, correct? Correct, one share, yes. But it doesn't say 50-50. Well, Your Honor, you're correct. That's correct. The language of the trust, as far as the formula, described these things by shares, didn't it? Well, it said the share. Actually, it just describes it in parts. And then the appointed property. Well, Your Honor, if you go to the amendment, Section 401, Division of Trust, you have subparagraph A, which talks about a portion, and I'm not using the word share because it's confusing because of the share, distributable share, which is the family name, but there's a portion. There's a portion in subparagraph A, which is you're supposed to give an amount equal to the positive difference between some concept and then that should be divided. Is that the share, distributable share? No, the share, distributable share, Your Honor. And the appointed property. The share, distributable share is defined at the end of Section 401. And if you know, it's embedded in 401, which talks about the division of the family trust property. Now, the family trust property is the assets that are available for distribution after the payment of debts, taxes, and expenses. So paragraph, the first part of Section 401 is directing the trustee to distribute the family trust property. Now, the trial court found in connection with two motions for summary judgment, and it was affirmed subsequently, that the family trust property is that which is available after the payment of debts, taxes, and expenses. The problem that's created is that at the end of Section 401, the definition of share, distributable share contradicts the concept of distributing the family trust property because the word taxable estate is inserted to make the share, distributable share calculation. Now, the taxable estate would and has to include all of the assets in Leon's trust on the date of his death and actually the calculations that start with essentially all of the assets that are part of Leon's trust and it also includes the assets of Frida's marital trust. The reader is then directed to increase the taxable estate by the value of the appointed property, which is the assets in Frida's marital and family trust as of the date of Leon's death and then to divide that sum in half. The problem with that calculation... Is there any question, though? Early on you indicated that there was no evidence about what Myrna received. Is there any question, though, that she did hold property in joint tenancy with Mr. Rosen and that she was given insurance proceeds? Your Honor, she did hold a condominium. There's never been an appraisal. A condominium or two? As far as I know, it's one condominium and it's never been appraised and I don't agree with counsel's representation it was worth a half a million dollars. I also honestly am not sure if in fact she received life insurance or perhaps Adrian received life insurance and I don't know the value of those proceeds. But again, Your Honors, I implore you to understand that it's our position that those assets do not factor in to whether or not Myrna was to receive assets under this trust. All right. Well, let me ask you this. Could you at least direct me to some document where the word 50% to Myrna, 25% to Adrian, and 25% to Jennifer appears? And we're talking about in the Fourth Amendment, Your Honor? In any document. Not the words one share and one share. Okay. Paragraph 401 of the original document says that the trustee shall divide the family trust into as many separate shares of equal value as are necessary to create the following. One share for Myrna and then one share for Adrian and Jennifer to be divided equally. And I take that from Article 4, Section 401, subparagraphs A and B. And, Your Honor, I think that concept carries over to the Fourth Amendment. The problem that we have is that, and you asked about Frieda's trust, and, Your Honor, originally Frieda's trust provided that the assets were to go to Myrna. Some of her assets were to go to Myrna and some were to go to Adrian and Jennifer. And there was no qualification on whether or not Adrian could have the benefit of those assets as long as she was married to Dan. And we've talked about this concept. Yeah, that's in your brief. Let me ask you, what is this Scrivener's Error suggestion? And I don't think you cited any authority when you used the words. What is the Scrivener's Error that you're referring to and what case would you rely on for this suggestion that something here was a mere Scrivener's Error? The Scrivener's Error, Your Honor, is that the draftsman says in the formula in Section 401, start with the taxable estate. By starting with the taxable estate, the person dividing the family trust property, which is, again, the assets that are available after the payment of debts, taxes, and expenses, one is always starting with an outrageously inflated number. And the reason it's outrageously inflated is because the definition of the shared distributable share does not account or adjust for the fact that state, federal, and Illinois estate taxes would be paid. And it doesn't account for the fact that included in Leigh Ann's taxable estate are assets that pass outside of the estate. So the term taxable estate starts with a number like this, but the provision is telling you to divide assets valued significantly less. And so that word, those two words, that clause, taxable estate, undermines two things. It undermines Leigh Ann's intent that Myrna receive assets of his trust because it frustrates that intent, again, that Myrna get a share and the trust get a share, and it frustrates the 50, 25, 25 percent overall plan. Well, those numbers, again, are coming not from any language. They're coming from the one share and one share. Well, one share for Myrna and then one share for Adrienne and Jennifer to be shared equally. Yeah, but you call that a Scribner's error. By what authority do you have that that would be a Scribner's error? Your Honor, I cited two, and I don't think those are the same. I know, but I don't think anything you cited would call that a Scribner's error. It is an error in the use of what should have been. It's our contention that the draftsman should have used the word family trust property. You can only distribute that which you have. Yeah, but we have to interpret the words in their plain and ordinary meaning. So how do we get around that? I mean, how do we call that a Scribner's error? How could we ever do such a thing? Well, if you were to give the words taxable estate their plain and ordinary meaning, solely in isolation, I think, Your Honors, and I think that would be contrary to Illinois law, I think you have to look at everything. You have to look at all of the documents. And to take taxable estate and give it its literal meaning, which is apply, distribute assets, distribute property that doesn't exist, it circumvents what is evident in the rest of the documents. And Illinois law clearly mandates that courts, in construing a trust, cannot consider a provision in isolation. And, in fact, I have case sites with those exact words, if Your Honors would like it. And the court cannot render other words meaningless or void. And that's what the court would have to do. It would have to determine that everything else that was said elsewhere in the documents is meaningless and that the formula – and I'm still not sure how the courts could do that because you have to reconcile the fact that taxable estate, that that's what – No, I have no problem in doing that. My problem is that you're calling that a Scribner's error. That's my problem. I don't find that to be a Scribner's error, and I find no authority in Illinois that says it would be. Then, Your Honor, I would suggest – We must take all of the documents to find the testator's intention, and that's what we intend to do. But to call it a Scribner's error, you know, it's not productive. And I understand Your Honor's point. So I would then refer the court to our other argument that this use of the term taxable estate creates an ambiguity. You have to reconcile the fact that there's a term in Section 401. Section 401, again, telling you distribute the family trust. But, by the way, I'm telling you to distribute starting with a number that's much bigger. Then I would argue that's an ambiguity, Your Honors. And at that point, this court has two choices. Myrna would proffer that there's no reason or no need to do that. Well, if there's an ambiguity, then why would the court grant summary judgment? Your Honor, I believe the trial court's – well, there were three rounds of summary judgments. The first two summary judgment motions addressed this issue that related to – well, first of all, plain as original summary judgment, they specifically argued that the formula created a specific bequest that must abate. And Judge Quinn said that's not true. Myrna's not intended to bear the burden of the residue. This was a distribution of the family trust property, and the overall plan was 50-25-25 in the aggregate. In the second motion for summary judgment, Myrna – I'm sorry, let me go back. In connection with the first motion, Judge Quinn denied that motion because he said that, unfortunately, Myrna had not provided sufficient evidence as to how the assets of the trusts, Bredas and Leons, were actually distributed. And so in her second motion for summary judgment, Myrna tried to do that for the court. And we were unable to convince the court of the exact numbers, in part because the numbers in the original complaint were not accurate, and in part because we didn't have – we were not able to reconcile everything. And so Judge Quinn, again, denied our motion for summary judgment. In their cross-motion, plaintiffs, on the second time around, abandoned this concept of a specific bequest that must abate, but continued to assert the same theory. And I believe that Judge Quinn saw through that and decided that he was going to stand on his ruling. Plaintiffs then filed the third motion for summary judgment. They made the same argument they made in connection with their second motion, the same argument that they're making to this court, which is read the formula in isolation and apply it. Distribute the lower-case property. Unfortunately, that's not for them, I believe. Well, the way the court construed this, though, there's no formula used. Your Honors, there's no dispute, and plaintiffs have confessed judgment on the issue that the assets were essentially distributed 50-25-25. And it's our position that that's consistent with all of the trial court's rulings on the motions for summary judgment. But it's completely inconsistent with the language that Mr. Rosen used in the trust document. Your Honor. The formula was not in any way used to come up with this distribution, was it? I think, Your Honor, the trustee, the co-trustee Bank of America, was faced with the very same problem the trial court has had to grapple with and what this court has to grapple with, which is you can't divide that which you don't have. You can't divide property when it doesn't exist, when the taxes have been paid and when... I'm sorry. It's a direction to distribute the family trust property. The family trust property is those assets that remain after the payment of debts, taxes, and expenses and does not include assets passing outside of Leon's trust. So you have a smaller number. It's a practical, logical, illogical result that plaintiffs are arguing because all that Bank of America had to divide was what was left. And so Bank of America, and there's support in the record for this, set up a plan of distribution. It essentially provided that the assets of Leon's trust, when coupled with his exercise of his powers of appointment over Frieda's assets, those assets went essentially 50-25-25. How do you reconcile this position with the case that counsel cited in his brief and the name of it escapes? The last case, Your Honor? Yes. Your Honor, I believe the last case, and that case was addressed in connection with the first rounds of motions for summary judgment, forces this court to accept this concept that the formula creates a specific request that abates. And that has been rejected. And I really want to point out to this court that in connection with the summary judgment motion, the court made a number of findings. And all of those findings were affirmed in the court's order granting Myrna's motion for summary disposition of major issues. The only issue that's disputed... Well, first of all, we're not really reviewing her findings at all. This is a de novo review. I understand that, Your Honor. So what Judge Pampley decided really has nothing for us. We don't really look at anything that she decided. We're looking at this anew. But the reason I raise that, Your Honor, is there's no issue raised as to the trial court's finding as to Leon's intent that Myrna inherit. And I think that's important because I think the documents, and this court should, looking at the documents... Well, why did the mother dispose of her trust assets entirely to the other two? Because she didn't. That is a misstatement, Your Honor. And I can pull out Frieda's trust for you. Frieda's trust established a mirror plan to Leon's. They were executed at the same time. And in her trust, the same plan, what I'm referring to as the 50-25-25 percent distribution is evident in her document. The problem is she passed away. Leon now has the power of attorney over her assets that are in her trust. Leon is worried about Dan, doesn't want Dan to receive the benefit of the assets. But if he permits Frieda's assets to go pursuant to the terms of her trust, what happens is he can't control, he can't keep Dan from getting any money. So he exercises these powers of appointment and then tries to compensate for it in the formula. Your opponent says that the way that the trial court actually divided this up, almost 69 percent went to Myrna. That's not correct. And 31 percent went to Adrian and Jennifer. Your Honor, I would refer the court to the allegations in the complaint. And I have this calculation right here, Your Honor. Just give me a minute. The second amended complaint in Paragraph 12 alleges that Myrna caused the proceeds from Leon's trust to be distributed as follows. $1,482,188 to Myrna, $332,995 each to Adrian's and Jennifer's trusts. The second amended complaint makes no allegations as to what happened with the appointed property. However, we know from Myrna's request to admit that the value of that property was $903,783. So if you divide that by 2, you get $453,891, which when added to their shares of the assets distributed from Leon's trust, each of the girls received $786,886, which if you multiply, comes out to $1,573,772. Very, very close to a 50-50 split. So, Your Honor, I believe that to the extent that those numbers, I don't know that they do or do not, include assets that passed outside of the trust, again, that is not relevant. The question is, what was Myrna to receive from Leon's assets and what did she receive? Why was Myrna entitled to any attorney's fees at all? She was representing her own interests. Your Honor, I don't believe that's the case. The trust had been fully distributed. It had not. There were actually assets that had not been distributed. In fact, it's those assets which will be credited against her attorney's fees. The trust had not terminated. And moreover, Myrna was protecting Leon's intent. The fact that she's a beneficiary of that intent should not preclude the fact that she was protecting it. And I'd like to point out, Your Honor, that this complaint, this case was brought. Never mind, I'm not going to go there. That's my answer, Your Honor. It's that essentially she was protecting Leon's interests and that was what the court found to be the case. And I do want to refer this court, and I apologize. I just found this case last night. It was on Westlaw. It was issued on March 11th. Excuse me, March 24th of this year. And it talks about the standard of review and can... For what? For the review of attorney's fees. And I wanted to point out that... Well, there's multiple cases regarding the... Your Honor, I... The review of attorney's fees is generally an abuse of discretion. Does this case say anything other than the standard of review? Well, what's interesting about this case, Your Honor, is it was a will contest. And the appellants argued that the question of whether or not the court had the authority to enter attorney's fees should be reviewed. If you want to ask to cite additional authority, you can do so in writing. And I do note that much of your authority does relate to cases involving wills and states, and yet this is really a trust case. Your Honor, there is case law to support the position that in extruing a will, the courts apply the same laws that would be... Excuse me, extruing a trust. But there are numerous decisions interpreting trusts. There are, Your Honor, and I think all of those cases are very factually individual. I don't think that there's overall clear precedent in any one case, although I would refer this Court to the oldest Oglesby case, which is cited in our brief and which specifically directs the Court in construing the intentions of the grantor within a trust to look at the documents in their entirety. Yes. And specifically the overall plan of distribution, and I think that's important because that is what's at issue here. There's also a case that I did not cite that I found... Well, again, you really shouldn't try to cite cases that your opponent hasn't had an opportunity to. Then, Your Honor, I... If you don't have anything further, you could sum up. Your Honors, in closing, I would ask this Court to find, as the trial courts did and I understand at the standard of review, that Leon did not intend to disinherit Myrna from the assets of his trust, and that had he intended to do so, he could have done it very easily. He did not need to go through the process of creating a convoluted formula that leaves Myrna with a value of zero. And more importantly, that if you look at... this Court looks at the documents in their entirety, they'll see that Leon did intend Myrna to receive a share, and that that share was commensurate with an overall plan of distribution of 50%, 25%, 25% in the aggregate, given Leon's exercise of his powers of appointment, and that that is evident from the original amendment and restatement as carried over to the Fourth Amendment. Thank you, Your Honors. Mr. Brooks? Thank you, Your Honor. Running through a number of points that I think have to be addressed. The property that passed outside of the estate, in one sense, I agree that it's not relevant. We should just be looking at the trust property. The reason that came up was counsel continually argues she was disinherited, she was disinherited. Well, she wasn't. There were plenty of provisions made for her, and only because of the claim of disinheritance is that important and should be at least considered. Well, don't you agree, though, that in order to glean the intent of the settler here, that we have to look at all the documents? I would never say you shouldn't look at all the documents, but by all the documents, it's all the documents. The trust documents. The trust documents, in effect, at the time of his death. When you ask counsel to point to the document she's referring to, she immediately goes to the section that has been amended four times as of his death. I'm talking about the way it's worded at the time of his death. She wants you to go back to the original trust documents, which are superseded by the amendments and say, let's do what he said there. So what are the only documents that you suggest we refer to at the time of his death? The most current amendments. Well, delineate them for us, if you would. The restatement. The restatement. The fourth amendment to the restatement. The fourth amendment to the restatement. That has the provision that applies here. That is what sets forth the formula that Leon says, divide up the assets and credas and my estate based on this formula. We can't go to, if you amend it, the earlier provision is dead. It's gone. It's been superseded. In what case do you rely on to tell us that the only documents we should be reviewing is the restatement, the fourth amendment to the restatement? Judge, I've not seen a case that dealt with that kind of an issue. There are no cases out there that have any similarity to a situation where the trust documents have been amended over time? And it doesn't say look at the last amendment and completely ignore anything that was agreed? I've not seen such a case where they address the issue of should we go back to the superseded documents or not. I think it's just common sense. Counsel said in her argument the concept of that original section carries over. Why? It's been amended. It's been changed. It doesn't carry over. And the fourth amendment refers to one share to each. True? There's no one share to Myrna, one share to... It actually says one share to Adrian, the other sister, our client, and Jennifer, her daughter, and the remainder to Myrna. Yes, you're right. And then it defines how to calculate the share for Adrian and Jennifer. Exactly. And it's called the share something share. With different spellings, S-H-E-R. Right, right. So it's hard to say without being confused. And anything further. Judge, I would just say that the defendant complains... But under your interpretation, Myrna is essentially disenfranchised. No, the money that could have gone to her was abated. And there's cases all over Illinois law, and many of you have cited them, where it's abated. An intention to give money to someone is abated because there's not enough money there. When you're getting the money that's left and there's no money left, that happens all the time. What about the error of the taxable estate language? Well, I don't know that that is an error. That's their contention. And if that's their contention, then they can pursue that in their malpractice action against the lawyer that drafted it. That's their remedy. They have added a third-party complaint against that person. And if they have the evidence and can prove that there was an error in that regard, that's their remedy. But they can't bring it in here without any evidence supporting that that was an error and say, let's just pretend it's an error. And courts have addressed these. Maybe the most important quote from an appellate court case on estates says, a court is limited to establishing not what the settlor meant to say, but rather what was meant by what he did say. And he set forth a mathematical formula, and we would ask this court to apply that in reaching a decision. Thank you. Thank you. The case was well-argued and well-briefed, and it will be taken under advisement.